Argued May 23, affirmed September 18, 1957

# MUNDT *v.* PETERSON ET AL

315 P. 2d 589

*George D. Leonard,* Deputy City Attorney, Portland, argued the cause for appellants. With him on the brief were Alexander G. Brown, City Attorney, and David H. Breuer, Portland.

*Harvey J. Osborn,* Portland, argued the cause for respondent. With him on the brief was Gregory L. Bounds, Portland.

ROSSMAN, J.

This is an appeal by the defendants from a judgment order which the circuit court entered in favor of the plaintiff. The latter is the widow of Gustav H. Mundt, deceased, who at the time of his death was a member of the Fire Department of the City of Port-

land. The defendants constitute the board of trustees of the Fire and Police Disability and Retirement Fund of Portland, which is created by chapter V of that city's charter, being §§ 5-101 through 5-132 of the charter. The plaintiff instituted this proceeding before the agency just mentioned by filing an application wherein she prayed that there be paid to her the benefits which § 5-117 of the chapter renders available to widows of Portland firemen who die in line of duty or as the result of one of the occupational disabilities that are mentioned in chapter V. The latter, after creating the Fire and Police Disability and Retirement Fund, makes provision for a board of trustees and prescribes in § 5-117 the circumstances under which the benefits which the Fund affords are payable. After the defendant board had denied the plaintiff's prayer, which was presented by application and also by a petition for review, the cause was brought to the circuit court by writ of review. The court's judgment order, based upon findings of fact and conclusions of law, held that the plaintiff was entitled to the benefits which she sought. The board thereupon appealed.

The plaintiff claims that the cause of her husband's death was "an occupational disability of heart trouble" as that term is employed in chapter V of the city's charter. The defendant board denies that heart trouble was the cause of death. It insists that, in any event, the primary cause of death was not heart trouble. The circuit court's findings of fact declared in part:

"(2) The medical evidence in this case is clear and without dispute that the death of the plaintiff petitioner's husband was proximately caused by heart trouble and heart disease.

"(3) The act in question, and particularly Section 5-117 thereof contemplates death by heart

trouble or heart disease as a proximate cause of the death, not only as an end result.

\* \* \*

"(5) The Board of Trustees of The Fire and Police Disability and Retirement Fund erred in that there was no medical evidence to support their finding that Gustav H. Mundt dies [sic] as a proximate result of any cause other than heart disease and heart trouble."

The appellants (the board) submit the following single assignment of error:

"The Court erred in determining there was no substantial evidence to support the denial of plaintiff's application by the Board of Trustees of The Fire and Police Disability and Retirement Fund."

To facilitate convenience, we will refer to the plaintiff-respondent as the plaintiff, to the defendants-appellants as the board and to the Fire and Police Disability and Retirement Fund as the Fund.

■ This cause, as we have seen, was brought to the circuit court by writ of review. ORS 34.040 provides:

"The writ shall be allowed in all cases where the inferior court, officer, or tribunal in the exercise of judicial functions appears to have exercised such functions erroneously, or to have exceeded its or his jurisdiction, to the injury of some substantial right of the plaintiff, and not otherwise. \* \* \*"

Upon writ of review the circuit court does not determine whether fact issues were correctly resolved by the agency whose order is under attack, and the findings of the agency will not be disregarded unless the record contains no substantial evidence in their support. *Oregon Coal & Navigation Co. v. Coos County,* 30 Or 308, 47 P 851, and *Smith v. City of Portland,* 25 Or 297, 35 P 665. It is, therefore, law questions that are analyzed and decided on writ of review. *Cur-*

*ran v. State,* 53 Or 154, 99 P 420; *Hall v. Dunn,* 52 Or 475, 97 P 811, 25 LRA(NS) 193.

■ As we have indicated, the plaintiff claims, and the board denies, that heart disease was the cause of Mundt's death, although it admits that he actually had heart disease. The board not only denies that heart disease was the cause of death, but it asserts that it possesses jurisdiction to construe the words "heart trouble" and "heart disease" as they appear in chapter V. According to the board, those terms refer only to diseases of the organ of the heart and to nothing else. That understanding of the term has been entertained by the board for some time, and it now invokes the rule that the construction which the agency charged with the administration of a statute places upon it, although not conclusive with the courts, is persuasive. *Lafferty v. Newbry,* 200 Or 685, 268 P2d 589; *Kelsey v. Norblad,* 136 Or 76, 298 P 199; and *Spencer v. City of Portland,* 114 Or 381, 235 P 279. While the rule which the board invokes is salutary, it does not privilege the agency to construe the law in a manner inconsistent with its unambiguous language or contrary to its evident purpose. *McCarthy v. Coos Head Timber Co.,* 208 Or 371, 302 P2d 238.

Section 5-115 of the aforementioned chapter V provides:

"For the purposes of this Act the disabilities of heart disease, hernia, tuberculosis and pneumonia are occupational disabilities and a member so disabled shall be entitled to the same benefits from the fund as a member injured in the line of duty or in the performance of duty, * * *."

Section 5-117 follows:

"If any member shall die from any cause while in the line of duty or as the result of an occupational

disability of heart trouble, hernia, tuberculosis or pneumonia, and shall leave a widow, said widow shall be entitled to the benefits while remaining unmarried and a resident of the state of Oregon."

Section 5-107 of the same chapter provides:

"It shall hear and determine all applications for pensions or benefits as hereinafter provided for; provided, however, that the Board shall review any of its determinations based upon the findings of its physicians upon the written request of any applicant; in such cases, it shall refer the matter to three physicians, one of whom shall be selected by the members of the Board, one of whom shall be selected by the applicant, and the third physician shall be selected by the other two physicians; the Board of Trustees shall base its findings upon review on the findings of the majority of the said physicians. Said Board is hereby authorized and empowered to administer oaths, subpoena and examine witnesses, to require the production and examination of papers and documents   *   *   *."

The plaintiff's claim for widow's benefits was twice submitted to the board. The first submission was by an application of the kind for which § 5-107 makes provision. Following receipt of the application, the board held a series of sessions in which it heard testimony and considered the application. August 19, 1955, the application was denied. Section 5-107 makes provision whereby an applicant may petition the board for a review of an order of denial. Following the rejection of her claim, the plaintiff filed with the board a petition for review. Thereupon, as required by § 5-107, the board appointed a representative upon the three-man medical panel which that section of the charter requires to be constituted upon that juncture. Its appointee was Dr. John P. Montague, the board's chief medical adviser. The plaintiff appointed Dr. Keith M.

Clisby, who had been her husband's physician. Those two appointees named as the third member of the panel Dr. Edward W. Davis. The three-man medical board met November 4, 1955, and wrote their findings in the form of a report which all three signed. Its draftsman was Dr. Montague. The material part follows:

"It was agreed that, as stated to you in my letter of May 3, 1955, a diagnosis of the hypertensive cardiovascular disease, predating the rupture of the aneurysm, which was the immediate cause of death, has been established. Pathological information received subsequent to my report shows that the aneurysm itself was involved in the cardiovascular disease, so that the wall of the aneurysm had been weakened. Ordinarily, if a congenital aneurysm (such as that suffered by Mr. Mundt) ruptures, it will do so in the third or fourth decades of life, so that Mr. Mundt had successfully passed the usual time for such an accident. If the rupture was due to the cardiovascular disease per se, it was because this aneurysm was involved in the cardiovascular disease, as evidenced by the deposit of calcium in its walls (hardening of the arteries). Thus it is presumed that the high blood pressure was the cause of the rupture of the sac, and that from a medical standpoint, the cause of death could be considered service connected, since the heart disease was the essential background."

Since the plaintiff claims that the cause of her husband's death was "heart trouble" or "heart disease," as those terms are employed in §§ 5-115 and 5-117, the question now occurs: did the report just quoted demand the entry of an order by the board granting the plaintiff the benefits which she sought? After the receipt of the report, the panel's three physicians gave testimony before the board which elucidated the report's

expressions. We will review briefly their testimony after we have taken note of some pertinent facts of a general nature.

The aforementioned Gustav H. Mundt joined the Portland Fire Department in 1937 and remained a member until May 2, 1955, when death overtook him. At the time of his demise, 17 years and 11 months after he had joined the department, he was 44 years of age and had advanced to the rank of battalion chief.

Mundt's death certificate recited that the ailment which led directly to death was an intracerebral hematoma [a tumor or swelling containing blood] and that the antecedent cause was a ruptured aneurysm of the left anterior cerebral artery. No occupational injury at or near the time of demise caused the death, and Mundt was not stricken while in the course of his official duties. Dr. Montague, when asked why the death certificate did not refer to the heart trouble which had afflicted the deceased, replied that a physician who completes the forms generally puts down "the first thing he has at hand"; that is, the most evident link in the chain of causation and not the underlying cause.

█ It will be noticed from our quotation of § 5-117 that it terms heart trouble, hernia, tuberculosis and pneumonia each as "an occupational disability." The parties agree that those four maladies are deemed by the charter as occupational. If a fireman dies of any one of them, it is not necessary that those who seek the benefits promised by the charter establish a causal connection between the occupation and the malady. *Blalock v. City of Portland,* 206 Or 74, 291 P2d 218. Evidently the members of the Fund are so susceptible to those four physical disorders that the charter deems them occupational.

The report of the autopsy which was performed upon Mundt's remains revealed among other conditions the following:

"Arteriosclerotic heart disease.
- A. Coronary atherosclerosis marked with myocardial fibrosis.
- B. Calcific aortic valvulopathy with stenosis slight.

"Hypertensive heart disease, clinical."

The report which disclosed the findings of a supplementary autopsy mentioned:

"Heart: Sections of myocardium show considerable variability in size of the individual myocardial fibers. There is extensive myocardial fibrosis. Section involving aortic valves show an extreme atherosclerosis with a large mineralized plaque in the fused parts of the leaflets. A sclerotic effect is apparent throughout the thickness of the aortic wall. Vasculature shows a marked intimal atherosclerosis with destruction of part of the muscular wall and some tendency to mineralization. The lumen's vessels are narrow.

"Aorta: Aorta sections show marked intimal and subintimal atherosclerosis with narrowing of effective musculature. There is mineralization and cholesterol deposit in the atherosclerotic plaque."

The board does not dispute the accuracy of the medical testimony, a substantial part of which was given by the boards' own medical adviser, Dr. Montague. The physicians who testified agreed that Mundt was afflicted with a heart disease. The organ itself was diseased, and the physicials mentioned especially a calcium deposit on a valve. The doctors used the term heart disease with broader denotation. To them, heart disease embraces cardiovascular disease, particularly when the effect of the disease is the degeneration

of the heart organ, together with the cardiovascular system. To the medical witnesses, no separation can be made of the elements of the cardiovascular system. To them, the heart and the circulatory system are embryologically extensions of each other which here suffered a joint affliction.

In view of the testimony of the medical witnesses, the board contends that, although § 5-107 requires it to abide by the findings of the three-man medical panel, it is not required to accept their definitions of the terms "heart disease" and "heart trouble." The board offers the definition of heart disease found in Webster's dictionary: "Any abnormal or morbid condition of the heart." We do not believe that the problem which this case presents will be solved through resort to definitions. The practical problem which we face is this: does the pathology of Gustav Mundt, as developed in the evidence, constitute heart trouble within the purview of the charter provisions. Obviously, the answer to the question depends in part upon an understanding of the term "heart trouble," but to a greater degree it demands an understanding of Mundt's pathology.

The physicians swore that Mundt's heart disease effected three phenomena: it weakened the wall of the aneurysm; it interfered with the normal functioning of the heart organ; and it caused a hardening of the vascular system. According to them, the heart, under the adverse circumstances just mentioned, labored, the blood gushed at great pressure through the rigid vessels, and the calcified wall of the aneurysm finally gave way. The doctors declared that those phenomena were so intertwined that the health or morbidity of the heart organ was meaningless unless considered with

reference to the entire system. Therefore, they characterized the over-all malady as heart disease.

We shall now take brief note of the testimony of the three members of the medical panel.

Dr. Clisby testified that by 1951 Mundt had a diseased heart. In that year he examined Mundt and, in describing what he found, stated:

> "He had hypertension at that time, he had arteriosclerosis, but not as extensive as he later developed and he had valvular disease with evidence of a heart murmur and a malfunction of the valve; so far back as 1951 we found evidence of pathology."

Mundt was unable to overcome his several maladies as is evident from the following question propounded by a member of the board and the answer given by Dr. Clisby:

> "In answer to the question given, I am led to believe that these three things—arteriosclerosis, high blood pressure and heart disease—were all present at the time of his death."

Dr. Clisby answered "Yes."

It will be noticed that the examination which was made in 1951 disclosed that Mundt was afflicted with more than one malady, one of which affected his heart. Much of the testimony that was given before the board revealed the relationship between the several ailments and the manner in which the heart disease supplemented and augmented the ill effects of the other disorders. For example, from Dr. Clisby's testimony we take the following:

> "Q  In your opinion, Doctor, in cases of this nature, can the vascular system be considered separately from the heart?
>
> "A  Not in this type of case.

"Q  And what is the reason for that, Doctor?

"A  Because the arteriosclerosis at the autopsy was found involving the heart as well as the vascular system."

The witness also testified:

"A.  No, he had heart disease, he had arteriosclerotic disease, he had hypertension, and he had a vessel that was dilated, and the combination of these factors brought about the rupture. Any one of these factors is part of the basic cause of death, but the original cause of death was the aneurysm."

Again:

"Our medical interpretation would be based on our factual and pathological findings, and if the pathology shows valvular disease or arteriosclerotic disease, or infarction, or damage to the heart, that is called a diseased heart, which this man had. He had a badly diseased heart, along with the rest of his trouble."

The three-man medical panel agreed that the rupture of the aneurysm, which was the immediate cause of death, would not have occurred but for the heart disease. By reverting to the panel's report, it will be observed that it states:

"Ordinarily, if a congenital aneurysm such as that suffered by Mr. Mundt ruptures, it will do so in the third or fourth decade of life, so that Mr. Mundt had successfully passed the usual time for such an accident."

Dr. Montague testified:

"Actually, the cause of death in this individual—the immediate thing that happened, that caused the clot in his skull—was the rupture of the aneurysm; but the aneurysm would not have ruptured if it hadn't been for the heart disease."

From Dr. Davis' testimony the following is taken:

"If this man had not had hypertension and heart disease, would this aneurysm have ruptured, and I think, no. He was past the age that these ordinarily rupture. If an aneurysm is going to rupture, we see it usually in children, in the twenties and thirties, usually without hypertension. This is a disease of younger people. It is not like the strokes that we see in old individuals who have arteriosclerosis. If they are going to get by, they usually, if they get past the forties, will not rupture. They will die of something else; but this man in addition had hypertension, which, of course, put more strain on it, more pressure on this sac, which is a weak link in his vascular structure. In addition, he had arteriosclerosis, which we know weakens the vessels, and it is a combination of these two things that caused the rupture."

We have mentioned the fact that the physicians testified that in cases such as Mundt's the heart and the circulatory system are deemed one, or extensions of each other. They expressed the belief that the disordered heart was the cause of death. Dr. Davis was asked whether Mundt suffered from "a cardiovascular disease," and answered, "Yes, sir, I think very definitely." He added that in cases of this kind the vascular system cannot be considered separately from the heart. Referring to the death, Dr. Davis testified:

"The underlying causes, I think, are his cardiac disease, his hypertension and arteriosclerosis."

He declared:

"My impression is that the heart further weakened the wall, and the hypertension, the actual pressure of blood in this sac, was just too much for it to hold."

Another of his answers was:

> "The man suffered from arteriosclerotic heart disease, which means that the wall of the aneurysm was weakened, and therefore, with increasing blood pressure, the aneurysm was liable to rupture."

We turn again to Dr. Montague's testimony. In this instance he testified:

> "Now, this aneurysm that Mundt had is a congenital disturbance, but the man was developing high blood pressure, which put more strain on the organ. The aneurysm is involved because it weakens the wall. Then you have increased pressure in a degenerated tube and, finally, it blows out. He ruptured this place because it was a little weaker. Still, the essential cause of this man's death was this quite rapidly developing arteriosclerosis and arteriosclerotic heart disease."

Again he testified:

> "The man has arteriosclerotic heart disease which is basically the cause of the increased pressure that blows the artery out."

We have noticed that the report signed by the panel of three physicians said:

> "Thus it is presumed that the high blood pressure was the cause of the rupture of the sac and from a medical standpoint the cause of death could be considered service connected since the heart disease was the essential background."

Indicating still further the importance which the three physicians whom we have mentioned and who comprised the panel attributed to the heart disease as the cause of death, we have the following from them:

Dr. Montague:

> "It was his rather rapidly advancing arteriosclerotic disease—cardio-vascular disease—which

in my opinion from a medical standpoint was the most important contributing cause of the rupture of the aneurysm."

Dr. Clisby:

"* * * the basic cause, I believe, is closely associated with a vascularcardiac condition which produced hypertension and in turn contributed to the rupture of the aneurysm."

Dr. Davis:

"The underlying causes, I think, are his cardiac disease, his hypertension and arteriosclerosis."

A reading of the report of the panel of three physicians, when studied in the light of the above explanations, renders the conclusion inevitable that Gustav Mundt's heart disease was an essential cause of his death.

We must now determine whether Mundt's stricken heart, as described in the preceding paragraphs, brought the plaintiff's application within §§ 5-115 and 5-117. During the hearings before the board, one of its members, who had helped draft §§ 5-115 and 5-117 prior to their submission to the voters, expressed his understanding of the terms "heart disease" and "heart trouble" as they occur in those sections. He also delineated the reasons which had prompted him to choose those terms. His explanations were inadmissible as evidence and could not be considered by the board in determining the meaning of the terms. The following is taken from 82 CJS, Statutes, p 745, § 354:

"* * * In a broader sense, however, the courts ordinarily will not inquire into motives which influenced the legislature, or individual members, in voting for the passage of a statute; or indeed as to the intention or belief of the draftsman, or of the

legislature, as far as it has not been expressed in the act."

See, also, 50 Am Jur, Statutes, p 328, § 336.

As stated in a preceding paragraph, the board contends that unless the heart organ is so diseased that the malady which afflicts it, alone causes death, no benefits are payable to the widow. Entertaining that view, the board deemed that it was not bound by the report of the panel of three physicians to hold that the cause of Mundt's death was heart disease.

We notice that § 5-115, in addition to classifying heart disease as an occupational disability, also lists hernia, pneumonia and tuberculosis as occupational diseases. Undoubtedly, the board would not reject the findings of a medical panel, appointed pursuant to § 5-107, which found that the malady which afflicted a fireman was, say, pneumonia or tuberculosis. In all likelihood, the board would conclude that the words "tuberculosis" and "pneumonia" are words of art and that men learned in medical science are more familiar with their connotation than the layman. We know of no reason for inferring that heart disease and heart trouble are any less words of art. The parties agree that for the purposes of this case the terms "heart disease" and "heart trouble" have the same meaning.

The function which the board was called upon to perform when it received the panel's unanimous report is stated in § 5-107 as follows:

"The Board of Trustees shall base its findings upon review on the findings of the majority of the said physicians."

Thus, for all practical purposes the findings of the panel became the board's findings. That being true,

the only thing that remained for the board to do after entering the panel's findings as its own was to determine whether, in a situation such as Mundt's, those findings disclosed "heart disease" or "heart trouble" as the cause of death. During the hearing before the board interest was displayed in a question as to whether or not, if Mundt had not suffered the rupture of the aneurysm but had applied for benefits because of his maladies, the board would have felt that his heart disease constituted an occupational disability. Dr. Montague informed the board that had he been familiar with Mundt's condition at that time he would have recommended that the board deem him totally and permanently disabled. He testified:

> "He would have been qualified for total and permanent retirement according to our interpretation of the act from a medical standpoint. In making those reports I would have stated after I had examined him and heard this heart murmur and demonstrated by X-ray that he had extensive heart disease, that this man from a medical standpoint should be considered totally and permanently disabled."

Thus, according to the board's chief medical adviser, Mundt's heart disease had disabled him and entitled him to retirement.

The question now presents itself: what is the meaning of the phrase "die * * * as the result * * * of heart trouble." (§ 5-117). The medical testimony leaves no room for any conclusion except that heart trouble caused the death. But the board argues that the heart trouble was the remote cause; it appears to be willing to deem it as the underlying cause. The board claims that § 5-117 is concerned only with the immediate cause. It views the medical testi-

mony as disclosing a succession of causes: first, the heart trouble; second, the ruptured aneurysm; third, the hematoma. It submits that the third was the cause of the death and that the heart trouble was remote. Its treatment of the subject is as if only the runner who brings in the flaming torch is entitled to consideration. We believe that the heart disease, the aneurysm and the hematoma can be likened to three dominoes, the first of which is pushed over by Providence, and then as it falls the second and third fall. The board argues that unless the heart disease is the last domino that falls, heart disease cannot be deemed the cause of death.

■ If the term "heart disease" in § 5-115 and the term "heart trouble" in § 5-17 have the same meaning, and if Mundt would have been entitled, had he lived, to retirement benefits under § 5-115 as suffering from an occupational disability of "heart disease," then his heart disease was within the meaning of "heart trouble" in § 5-117. Mrs. Mundt's right to widow's benefits would then depend upon her showing that her husband had died "as a result * * * of * * * heart trouble." The question of whether or not he died "as a result" of heart trouble was a question of fact for the medical panel to answer and, since it answered the question in favor of the plaintiff, the board was bound to accept that determination of the issue.

In this case, all of the testimony demonstrates that Mundt suffered from a syndrome of which the heart disease was a component element. Some of the medical testimony refers to the heart disease as the underlying cause and the essential background, but the physicians avoided categorizing the causes which made up the syndrome in degrees of remoteness. They explained that the rupture of the aneurysm and the hematoma

were the mechanical means whereby the heart disease killed. The doctors agreed that but for the heart disease Mundt's death would not have occurred.

We conclude that the report of the panel of three physicians, when elucidated by the testimony which they gave and which we reviewed in preceding paragraphs, establishes that Mundt suffered from heart trouble as defined by Webster in the definition upon which the board depends. The physicians, in their report and as witnesses, determined that the heart trouble caused the death. The death was, therefore, compensable, and the plaintiff is entitled to the benefits promised by the charter.

The judgment of the circuit court is affirmed.