Argued December 16, 1970, reversed and remanded with
instructions January 28, petition for rehearing
denied February 23, 1971

EVANS, *Respondent, v.* SCHRUNK et al,
*Appellants.*

479 P2d 1008

*Ellis E. Gerdes*, Portland, argued the cause for appellants. With him on the briefs were Marian C. Rushing and Robert L. Hurtig, Portland.

*Raymond J. Conboy*, Portland, argued the cause for respondent. With him on the brief were Pozzi, Wilson & Atchison, and Garry L. Kahn, Portland.

Before SCHWAB, Chief Judge, and LANGTRY, BRANCHFIELD* and HOLMAN, Judges.

LANGTRY, J.

The question in this case is whether plaintiff, an inactive policeman, is entitled to service-connected or nonservice-connected disability under the City of Portland's Fire and Police Disability and Retirement Fund, created and administered pursuant to the provisions of Chapter 5 of the city's charter. Service-connected disability pensions are substantially the larger.

The defendants, the Board of Trustees of the Fund, created by Chapter 5, ruled against plaintiff's claim for service-connected disability as of October 16, 1969, after having allowed it from January 10, 1968. Plaintiff took a Writ of Review (ORS 34.010 through ORS 34.100) to circuit court, which reversed the Board, holding the Board had "exercised its functions erroneously and/or arbitrarily to the injury of a substantial right of the plaintiff." Defendants ap-

---

* Branchfield, J., did not participate in this decision.

peal the circuit court ruling. The circuit court correctly tried the Writ on the record made by and brought from the Board. See *Wing v. City of Eugene*, 249 Or 367, 371, 437 P2d 836 (1968).

The record discloses that between February 13, 1968, and November 10, 1969, the Board discussed and took action on plaintiff's claims at 15 different meetings. These actions included, *inter alia*, allowing the claim involved here, suspending it pending further medical reports, reinstating it, appointing three-man medical panels to consider it at plaintiff's request on two occasions, disallowing another unrelated claim, and finally reaffirming its final decision to terminate service-connected disability benefits.

Plaintiff had been a policeman for 18 years. His injury occurred when he slipped and fell upon a knee while performing his official duties. The jar of the fall caused a slight injury to the knee and a cervical sprain. From the latter, supported by medical evidence, the plaintiff claims an emotional disorder evolved which permanently prevents him from continuing as an effective police officer.

The subject pension plan has been often litigated by way of writs of review.[1] Oregon Laws 1965, ch 292, p 632, added a third ground, arbitrariness, as cause for use of the writ. ORS 34.040 now provides that the writ may lie if a tribunal appears to have exercised its functions (1) erroneously, or (2) arbitrarily, or (3) to have exceeded its jurisdiction. This controversy is properly before us on the writ.

---

[1] See Vollmer v. Schrunk, 242 Or 196, 409 P2d 177 (1965); Hicks v. Schrunk, 238 Or 181, 393 P2d 771 (1964); Miller v. Schrunk et al, 232 Or 383, 375 P2d 823 (1962); City of Portland v. Garner et al, 226 Or 80, 358 P2d 495 (1960); Mundt v. Peterson et al, 211 Or 293, 315 P2d 589 (1957).

440

■ The trial court held that the Board's action was "erroneous and/or arbitrary." The procedural error asserted against the exercise of the Board's functions was that it designated different personnel the second time than it did the first time a medical panel was requested.

Section 5-106 of Chapter 5 of the Charter provides:

"Section 5-106. BOARD OF TRUSTEES. The * * * Fund shall be under the supervision and control of the Board of Trustees * * *. [The Board consists of the Mayor, City Treasurer, City Auditor, fire and police chiefs and six members popularly selected, three each from the fire and police departments. The Fund consists of public money contributed by the city and contributions from the pay of policemen and firemen.]"

Sections 5-107 and 5-115 of the Charter provide:

"Section 5-107. POWERS OF BOARD. Said Board of Trustees shall have the power to prescribe its own rules and regulations * * *. Said Board is hereby authorized and empowered to designate one or more regularly licensed physicians or psychiatrists * * *. Said Board is further authorized and empowered to require applicants for pension and/or benefits from the Fund and persons receiving pensions or benefits from the Fund to submit to and undergo mental and physical examinations by one or more regularly licensed physicians or psychiatrists, designated by said Board for that purpose. * * * It shall hear and determine all applications for pensions or benefits as hereinafter provided for; provided, however, that the Board shall review any of its determinations based upon the findings of its physicians or psychiatrists upon the written request of any applicant; in such cases, it shall refer any matter concerning a question of physical or mental condition

to three physicians or psychiatrists, one of whom shall be selected by members of the Board, one of whom shall be selected by the applicant, and the third shall be selected by the other two selectees; the Board may re-refer the matter to the physicians or psychiatrists for clarification and may obtain the reports of medical specialists for the information of the panel of three physicians or psychiatrists. The Board of Trustees shall base its findings upon review on the findings of the majority of said panel of physicians or psychiatrists *as to the mental or physical condition of the member. * * * The Board may order any member drawing benefits or pension for disability to appear, submit to and undergo physical and mental examination*; after the Board acts upon the basis of such examination, such member may request in writing the appointment of a panel of physicians or psychiatrists and in such cases, the procedure set forth above relating to such panels and their findings shall be followed. If the Board determines from its review of the findings of a majority of said panel of physicians or psychiatrists that such member is no longer entitled to draw benefits or pension for disability *as a result of change in his physical or mental condition*, the Board shall forthwith cease the payments of such pension or benefits * * *.

"Any person adversely affected by a determination of the Board based upon the findings of its physicians or psychiatrists, desiring a review of such determination, may apply for review by a three-man medical panel by filing with the Secretary of the Board a written request for such review within thirty (30) days after such determination by the Board." (Emphasis supplied.)

"Section 5-115. BENEFITS FOR SERVICE-CONNECTED DISABILITY OR OCCUPATIONAL DISABILITY. Upon * * * application of a member *and a finding by the Board that through injury suffered in line of duty*, * * * the member is or has been unable to perform his required

duties, said member shall be paid service-connected disability benefits * * * *until such member recovers* * *.

"* * * * *

"No member shall be given service-connected disability benefits * * * if the Board finds that said disability can probably be successfully corrected by competent medical or psychiatric treatment * * *.

"* * * * *." (Emphasis supplied.)

On July 19, 1968, the first medical panel was authorized, composed of psychiatrists Dr. Paltrow, designated by the plaintiff, Dr. Saslow, designated by the Board, and Dr. Petroske, chosen by the first two. The claim was allowed on the basis of this panel's unanimous findings. Dr. Paltrow continued treatment, as the panelists had recommended, and on the basis of what he said in his reports, the Board terminated benefits as of October 16, 1969. Plaintiff immediately requested another medical review, which the Board granted. This time plaintiff again designated Dr. Paltrow, but the Board designated Dr. Montague, the Board doctor. These two selected Dr. Thompson. In this panel's report, doctors Montague and Thompson concluded that plaintiff would have suffered the same illness in other employment with supervision, and that the illness was not a direct result of plaintiff's employment as a police officer. Dr. Paltrow disagreed.

The Charter makes no specific requirement that the personnel of a second panel must be the same as the first. The Board is given broad authority to administer the Fund. We do not think we may read into Chapter 5 a restriction on the Board's authority to appoint a different panel member under the circum-

stances existing here. Fifteen months elapsed after the first panel was formed before the second was. We note in the record that on May 13, 1969, a date between the appointment of the two panels, it was noted that the Board had been unable to contact Dr. Saslow, the Board's designee on the first panel, for advice because of his absence from the city, and had to hold up action until he could be contacted. The Board should be free to appoint doctors who can give prompt service. The circumstances of doctors in this regard can be expected to change. We find no error or arbitrariness in these Board proceedings.

■ Apparently, no appellate decisions interpret the meaning of the word "arbitrary" as it was added to ORS 34.040 in 1965. The use of the word in similar situations relating to other boards is interpreted to mean:

> "* * * in disregard of facts and circumstances of the case * * * where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached * * *." *Jehovah's Witnesses v. Mullen et al*, 214 Or 281, 296, 330 P2d 5, 74 ALR 2d 347 (1958), *appeal dismissed* 359 US 436, 79 S Ct 940, 3 L Ed 2d 932 (1959).

Citing *Mullen*, the District of Columbia Court of Appeals in *Herbert Harvey, Inc. v. N.L.R.B.*, 424 F2d 770 (1969), said at 783:

> "* * * Administrators, no less than judges, may differ in their views on the same subject without becoming arbitrary * * *. Certainly when the administrative determination on that score stays within the zone of reasonableness, we are not at liberty to upset it simply because another determination might also be logical * * *."

The circuit judge made no findings. After argument by counsel, during colloquy, he said:

"* * * about an arbitrary action without anything to substantiate the action. I presume I would have a right to review that * * *.

"* * * * *

"When the Board * * * cut off his benefits as of October 16, they did so with no evidence * * * that then is not only an incorrect finding from a substantive standpoint, but also from a procedural standpoint. They had nothing * * * except * * * a desire * * * to keep the fund from being depleted * * *.

"* * * * *

"* * * Does it [ch 5 of the Charter] mean disabled from doing anything or simply disabled from going back on the job? * * * I came to the conclusion that * * * it * * * says * * * disabled from going back on the job.

"* * * he is disabled from being a police officer; I think that is clear.

"* * * I am discussing what I interpret the file to mean and this has nothing necessarily to do with the decision. What caused the disability? Maybe it was Paltrow's treatment * * * even so * * * the thing that got him started on it was the original injury * * *.

"He is disabled from going back to being a policeman because of an injury * * * then he is disabled under the act. I can't read it any other way."

The Charter provisions we have quoted require the Board to decide whether an injury was in line of duty. The medical panel, under the Charter, decides the mental or physical condition.

When the Board made its last decision, after working with the case for more than 21 months, hav-

ing taken some action on it in 15 different meetings and having had much medical advice, it was faced with conflicting advice and evidence. The first medical panel said there was an emotional disorder attributable to the work injury. The Board acceded to that opinion, and plaintiff was treated by Dr. Paltrow as that panel recommended. As that panel had suggested, a progress report was requested after six months elapsed. That report resulted in continued benefits and in six months another report was made. This report from Dr. Paltrow, which was the basis for the October 16, 1969, cut-off action mentioned in the circuit judge's remarks above, stated:

> "* * * [H]e is now on a plateau * * * I would anticipate his need for group therapy for a number of months * * * the bulk of therapy, directly related to the accident and *subsequent psychopathology seems to have been taken care of * * **."* (Emphasis supplied.)

The meaning we attribute to this language is that the bulk of the emotional disorder directly related to the accident had been taken care of. The Board so understood it. The plaintiff at that time had entirely regained a substantial weight loss he had suffered, and this was known to the Board. Based on this evidence, and pursuant to Section 5-115 of Chapter 5, the Board terminated his work-connected disability as of October 16, 1969. Within a month thereafter, Dr. Paltrow sent a new report, saying it was prompted by plaintiff's attorney. He said that plaintiff's illness was service-connected, further treatment was needed, and a return to active duty was not indicated. The plaintiff had also requested the second medical review, and the second panel of three doctors was formed. As previously noted, two of this panel ad-

vised that the illness was not service connected. As we have emphasized, Section 5-115 requires the Board to make the line-of-duty decision. Considering the reports before it, the Board's final determination was based on evidence.

Our review indicates that the circuit court substituted its judgment that the illness was a line-of-duty injury, however reasonable it might be, for an opposite but reasonable finding of the Board. Both were formed on evidence in the record. Under such circumstances, the Board's judgment must prevail.

Reversed and remanded, with instructions to affirm the Board action and direct it to proceed in accordance with its decision.