Argued January 29, affirmed September 17, 1958

# MILWAUKIE COMPANY OF JEHOVAH'S WITNESSES *v.* MULLEN ET AL

330 P. 2d 5

*Hayden C. Covington,* Brooklyn, New York, argued the cause for appellant. With him on the briefs was Carl D. Etling, Portland.

*John O. Sheldahl,* Oregon City, argued the cause and filed a brief for respondents.

Before PERRY, Chief Justice, and LUSK, WARNER and KESTER*, Justices.

## WARNER, J.

The appellant, Milwaukie Company of Jehovah's Witnesses, a corporation, as petitioner, instituted this proceeding for a writ of mandamus directing the Mayor and Councilmen of the city of Milwaukie, Oregon (hereinafter called "the Council") to issue a permit to appellant authorizing it to erect a church in an area of that city restricted primarily as a residential zone for single-family dwellings.

Upon the conclusion of the presentation of appellant's evidence, the Council moved to discharge the alternative writ and dismiss the proceeding on the ground that the petitioner had failed to prove a sufficient case. From the ensuing order of non-suit, the Witnesses appeal.

The uncontradicted facts disclose: that the zoning Ordinance No. 481 was adopted in June, 1946; that the appellant, in 1953, acquired two lots, in Milwaukie, Oregon, together 100' x 100' in size; that this property is on Penzance Street, between Campbell and Elm Streets, and within the zoning area 3-R-1 (Section 16,

---

* Resigned March 1, 1958.

subsection 3 (1 to 5, inclusive))[1] reserved for single-family dwellings; that the appellant first applied to the City Planning Commission for a special-use permit, as provided by Section 16, subsection 3 (8)[2], of the zoning ordinance; and that the application was denied by that body. It thereupon appealed to the City Council, when, after notice and a hearing, the request of the Witnesses was unanimously denied.

The heart of the zoning ordinance is in Sections 2 and 3 of that legislation. They establish the minimum standards for the general welfare:

"Section 2. Scope. No building or land shall hereafter be used and no building or part thereof shall be erected, moved or altered unless in con-

---

[1] *Ordinance 481, § 16, subsection 3 (1 to 5, incl):*

"In the residential zone no building or premises shall be used, and no building shall hereafter be erected or structurally altered, unless otherwise provided in this ordinance except for one or more of the following uses.

"1. One family dwelling. 2. Libraries and art galleries. 3 Parks (including park buildings). 4. Accessory buildings and uses, such as are ordinarily appurtenant to single family dwellings, shall be permitted, including one private garage, when located not less than twenty (20) feet from any flanking street line, or when attached to or within the dwelling.

"5. The office of a physician, dentist, or other professional person when located in his or her dwelling, also home occupations engaged in by individuals within their dwellings are permitted provided that no window display is made or any sign shown other than one not exceeding two square feet in area, which if illuminated, shall be of non-flashing low candle power design, and shall bear only the name and occupation of the occupant.

"The renting of rooms for lodging purposes only, for the accommodation of not to exceed eight persons, in a single family dwelling may likewise be permitted with the approval of the Commission subject to review by the Council."

[2] *Ordinance 481, § 16, subsection 3 (8):*

"Special permits are required from the Commission for the following uses:

"(A) Circuses, Fairs, Carnivals
"(B) Nursery or Greenhouses
"(C) Telephone Exchange
"(D) Electric Substations
"(E) Churches
"(F) Schools (Public or Private)
"(G) Lodge Buildings or Fraternity Houses
"(H) Playgrounds and Parks
"(I) Two Family Dwellings

"Such permits are to be issued after the commission has been satisfied as to the propriety of such use. The Commission may limit the duration of such permits as it may deem advisable."

formity with the regulations herein specified for the district in which it is located except as otherwise provided herein. No permit for the construction or alteration of any building shall be issued unless the plans, specifications, and intended use of such building conform in all respects with the provisions of this ordinance.

"Section 3. Minimum Requirements for General Welfare. The provisions of this ordinance shall be deemed the minimum requirements to encourage the most appropriate use of land; to conserve and stabilize the value of property; to provide adequate open spaces for light and air; to prevent undue concentration of population; to lessen the congestion on streets; to facilitate adequate provisions for community utilities and facilities such as transportation, water, sewage, schools, parks and other public requirements and to promote the public safety, health, convenience, comfort, prosperity and general welfare of the people of the City of Milwaukie, Oregon."

It is in Section 3, we find the standards controlling the powers of administrative discretion conferred on the Council when it considers applications for issuance of special-use permits sought under Section 16, subsection 3 (8), supra.

So far as zoning ordinances relate to the location of churches within zoned areas, there are, generally speaking, three kinds:

(1) Ordinances expressly classifying churches as being in residential districts. For illustrations of this type, see cases cited in *State ex rel. Roman Catholic Bishop of Reno v. Hill,* 59 Nev 231, 90 P2d 217 (1939);

(2) Ordinances expressly excluding churches from residential areas. *Corporation of Presiding Bishop v. City of Porterville,* 90 Cal App2d 656,

203 P2d 823 (1949); dismissed for want of substantial federal question, 338 US 805, 94 LEd 487, 70 S Ct 78; rehearing denied, 338 US 939, 94 LEd 579, 70 S Ct 342;

(3) Ordinances which are permissive as to the location of churches within a residential area, that is, by permit following an application for and hearing by a designated zoning authority.

The Milwaukie ordinance is of the latter or permissive type (Section 16 (8) Ordinance 481). See *Congregation Committee, North Fort Worth Congregation, Jehovah's Witnesses v. City Council,* 287 SW2d 700 (Court of Civil Appeals of Texas, 1956).

■ Appellant claims, in the case at bar, the Milwaukie ordinance does not exclude churches. It says: "This case involves an ordinance that permits churches in the zone," a conclusion which would seem to place the Milwaukie ordinance in the first of the three above-enumerated types of "church" zoning. In this, appellant is in error. It misconceives the character of the ordinance if appellant assumes the ordinance allows a church a permit to build as a matter of absolute right. It is a conclusion that overlooks the ordinance's distinctively permissive character. Under Section 16 (8), supra, special-use permits are, if issued, to churches, and the other institutions therein enumerated, only "after the commission has been satisfied as to the propriety of such use." Its judgment on the "propriety of such use" is, as we have noticed, guided by the minimal requirements established by Section 3, supra. So, too, is the judgment of the Council when considering an appeal from a ruling of the commission. To hold otherwise would be to render nugatory one of the zoning ordinance's most salutary features.

■ Since defendant's motion for a non-suit was allowed, there is before us only the evidence presented by the plaintiff-appellant. In determining whether or not the circuit court erred, we accept that evidence as true and view it in the aspect most favorable to the plaintiff. *Cox v. Sanitarium Co.,* 181 Or 572, 573, 184 P2d 386; *Marr v. Putnam,* 196 Or 1, 25, 246 P2d 509.

The evidence adduced by appellant, considering the burden cast upon it, is exceedingly meager and at places vague and fragmentary. The record consists solely of the testimony of two witnesses, a Mr. Hughart, its presiding minister, and a Mr. Klein, one of the defendant councilmen called as an adverse witness, and two exhibits. One exhibit was a photograph of a scale drawing of the prospective church, the other a copy of Zoning Ordinance 481. The testimony of the witnesses does not cover more than twenty-seven pages of the transcript.

We examine the record to determine whether the appellant made a prima facie case in support of the allegations in the alternative writ of mandamus, and upon which its right to a peremptory writ depends. There are four material allegations. The first is: The council acted capriciously and arbitrarily without regard to the facts. The second is: That the zoning ordinance "which prohibits the erection and maintenance of a building to be used as a church in Class 3-R-1 [single dwelling], residential district of the City of Milwaukie is unconstitutional and void," as a deprivation of appellant's property rights without due process and in violation of the Fourteenth Amendment of the Federal Constitution. The third: That it is unconstitutional and void as a denial to plaintiff of the equal protection of the law, that is, that it is discriminatory under the same section of the Federal

Constitution and Section 20, Article I of the Oregon Constitution, in that it attempts "to grant to other citizens or classes of citizens privileges and immunities which upon the same terms are denied to the plaintiff." The fourth is: That the zoning ordinance and the actions of the Council trespass on the right of freedom of worship under the Fourteenth Amendment, interpreted as embracing the freedoms guaranteed by the First Amendment, and as protected by Article I, Section 2 of the Oregon Constitution. We interpolate to observe that the guarantee of religious freedom found in the Federal Constitution is identical in meaning to Article I, Section 2 of the Oregon Constitution, although expressed in different language. *City of Portland v. Thornton,* 174 Or 508, 512, 149 P2d 972 (1944).

The several assignments of error in the main follow the material allegations of the complaint as above outlined, except, appellant, in its brief, waives its attack on the validity of the ordinance per se, and rests its representation of unconstitutionality on the resultant action of the council. Thus it says: "The plaintiff contends that it is the order of the City Council that has deprived it of its constitutional rights. This contention is not that the ordinance is void or that any part of it is illegal on its face. The position of plaintiff is that the law is unconstitutional as construed, applied and enforced by the board. The constitutionality of the law is to be determined according to the particular facts of the case." The same variant in position from the allegations found in the writ is likewise reflected elsewhere in its briefs.

■ We recognize and accept as established law, that even if a legislative enactment is not void or unconstitutional on its face, the manner of its enforcement

and application may render such action unconstitutional as to the parties affected. *Yick Wo v. Hopkins,* 118 US 356, 30 LEd 220, 6 S Ct 1064 (1886) ; *Concordia Fire Ins. Co. v. Illinois,* 292 US 535, 545, 78 LEd 1411, 54 S Ct 830 (1934).

Before proceeding further, it is well to give attention to certain rules which will have a bearing on our conclusions.

■■ When this court reviews the action of an administrative agency performing duties outside the judicial branch, it is limited in the scope of its inquiry. It does not try the matter de novo and is constrained by certain well-established rules and presumptions favoring regularity on the part of the administrative agency. *Richardson v. Neuner,* 183 Or 558, 564, 194 P2d 989 (1948) ; *Blitz v. Neuner,* 194 Or 1, 5, 240 P2d 1193 (1952). The Milwaukie City Council when conducting a hearing on an application for a special-use permit under the zoning ordinance was acting as such an administrative agency. 8 McQuillin, Municipal Corporations (3d ed), 336 § 25.147, and cases cited. Ibid, 543, § 25.215 ; 616 § 25.254.

■■ Even in the absence of a statute the courts employ presumptions favorable to the regularity of administrative action. *State ex rel. v. Duncan,* 191 Or 475, 498, 230 P2d 773 (1951). All legal intendments are in its favor. Its action will be presumed valid, reasonable, correct, taken in knowledge of material facts, justified by the facts, made upon full hearing or after giving all interested parties a reasonable opportunity to be heard and upon appropriate evidence duly considered and properly applied. 42 Am Jur 680, Public Administrative Law § 240 ; 73 CJS 391, Public Administrative Bodies and Procedure § 63 ; *United States v. Chemical Foundation,* 272 US 1, 47 S Ct 1, 71 L Ed

131. Also see *Pacific Tel. & Tel. Co. v. Wallace,* 158 Or 210, 223, 75 P2d 942; *Ring v. Patterson,* 137 Or 234, 240, 1 P2d 1105. It is a presumption which also applies with equal force to acts of officials in the exercise of powers in zoning matters. 8 McQuillin, Municipal Corporations, supra, 801 § 25.328; 62 CJS 570, Municipal Corporations § 228(3); Anno 168 ALR 146.

■ Every statute is presumed to be constitutional, and all doubt must be resolved in favor of its validity. As a corollary, he who assails it has the burden of establishing its invalidity. *Fox v. Galloway,* 174 Or 339, 347, 148 P2d 922, and cases there cited; *Detroit International Bridge Co. v. Corporation Tax Appeal Board of Michigan,* 287 US 295, 297, 53 S Ct 137, 77 L Ed 314.

■ The same burden prevails when one asserts, as here, that the acts of an official, or group of officials, functioning under a statute valid on its face, are so arbitrary and unreasonable as to trespass upon the aggrieved party's constitutional rights.

"By reason of the presumption of validity which attends legislative and *official action,*" says Mr. Justice Van Devanter, in *Concordia Fire Ins. Co. v. People of State of Illinois* (292 US, supra, at 547), "one who alleges unreasonable discrimination must carry the burden of showing it." (Emphasis ours.) This, too, is the rule in many jurisdictions in zoning cases. *Nutini v. Zoning Board of Review of City of Cranston,* 78 RI 421, 82 A2d 883, 885 (1951); *Kindergan v. Board of Adjustment of Borough of River Edge,* 137 NJL 296, 59 A2d 857, 858, 859 (1948); *People ex rel. Polcini v. Scofield,* 108 NYS2d 778, 780. Also see 8 McQuillin, supra, 801-04 § 25.328.

■ When recourse is had to the extraordinary

remedy of a mandamus, the general rule is that the burden is on the party holding the affirmative of the issue to prove all facts necessary to authorize its issuance (55 CJS 559, Mandamus § 325), and he must show a clear, complete legal right to have the act performed. *Horsefly Irr. Dist. v. Hawkins,* 121 Or 366, 372, 254 P 825; *Lyons v. Gram,* 122 Or 684, 690, 260 P 220; *Morris Co. v. Port of Astoria,* 141 Or 251, 268, 15 P2d 385; *Ross v. County Court of Marion,* 147 Or 695, 701, 35 P2d 484.

Appellant, however, represents that when a church seeks a permit, the burden is upon the Council to show its reasons for denying the application. It relies upon the following cases in support of this claim: *Applestein v. Mayor and City Council of Baltimore,* 156 Md 40, 47, 143 A 663 (1930); *State ex rel. Synod of Ohio of United Lutheran Church v. Joseph,* 139 Ohio St 229, 39 NE2d 515, 138 ALR 1274 (1942); and the opinion of the lower court in *Board of Zoning Appeals v. Decatur, Ind. Co. of Jehovah's Witnesses,* 233 Ind 83, 117 NE2d 115 (1954).

We find no merit in this contention. We find nothing in the cases cited that would justify its representation that a special rule exists exonerating a church from assuming the burden of proof necessary to overcome the presumption of regularity of action on the part of an administrative agency. The Maryland case, supra, the case relied on in a few jurisdictions, did not involve church property. In the Indiana case, the Supreme Court makes no reference to the burden-of-proof rule one way or the other.

■ This court has long and consistently held that there is a presumption that public officers perform their duties regularly and in accordance with the law; that the burden is upon him who claims to the contrary.

We adhere to this position notwithstanding what may be a different rule in Maryland or Ohio. If a further reason for that position is necessary, we recall that this is a proceeding in mandamus, where, as we have stated, a heavy burden is on the petitioner to make its case.

### Was the Council's Treatment of Facts Arbitrary and Capricious

With these various rules in mind, we now give attention to the trial record of the Witnesses' case in the circuit court.

Appellant asserts that the court erred because, as it claims: "The admitted facts and the undisputed evidence show that the plaintiff had a clear legal right to have issued a permit to build and use the church in the residential area and that there was a plain legal duty on the part of the defendants to issue the permit and that the denial of it was arbitrary and capricious."

This proposition is addressed to the administrative action of the Council and its methods and motives in arriving at its final determination, irrespective of the legal validity of the ordinance. This is tantamount to a declaration that the Council in denying the petition of the Witnesses ignored the factual presentation made at the hearing and reached its conclusions without any adequate factual foundation or controlling principle.

Appellant's presiding minister, Mr. Hughart, although personally present at the Council hearing, did not testify in the circuit court to one matter that occurred at that hearing, except to say that the Council was shown a scale model of the proposed church building, a picture of which is one of the exhibits here. From Mr. Hughart, we obtain nothing that remotely

indicates that the Council acted in an arbitrary or capricious manner. This witness also outlined the number of regular meetings or services, the time consumed and the usual number attending, the capacity of the planned off-street parking space, as well as the seating capacity of the church. If these matters were brought to the attention of the council, the record does not tell us.

All of the relevant testimony concerning what transpired at the hearing comes from Councilman Klein. From him, we learn that among the reasons advanced in opposition and which apparently persuaded the vote of Mr. Klein and the other members of the Council were "the traffic hazards," "the condition of noise and fumes and lights," and its enusing "effect * * * on the value of property" in the immediate vicinity if the application was granted.

The foregoing reasons assigned by Mr. Klein find their counterpart in the minimal requirements established by Section 3, supra, of the zoning ordinance.

■ The terms "arbitrary and capricious action", when used in a matter like the instant one, must mean willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. On the other hand, where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion had been reached. *In re Buffelen Lbr. & Mfg. Co.,* 32 Wash2d 205, 201 P2d 194, 196 (1948); *Lillions v. Gibbs,* 47 Wash2d 629, 289 P2d 203 (1955); *State Board of Tax Com'rs. v. Chicago, M., St. P. & Pac. R. Co.,* 121 Ind App 302, 96 NE2d 279 (1951).

The presumption favorable to the reasonableness and validity of the action of the board, says McQuillin,

Municipal Corporations, supra, at p 805, "must be given great weight especially by a higher court after the lower court has sustained the administrative decision. Accordingly, the decision of a zoning board as to a permit, certificate of approval, special use, variance, exception or the like must stand, unless it clearly and plainly is shown that the decision is against the weight of the evidence or erroneous, unreasonable, or arbitrary, or unless it is shown that the board acted arbitrarily or capriciously, that it arrived at its determination in an unfair manner, that its action was illegal, that it abused its discretion, or that it acted under an unreasonable ordinance." Also see *Rexon v. Board of Adjustment,* 10 NJ 1, 89 A2d 233, 234-5 (1952) (decision by Brennan, J., now of U. S. Supreme Court); *Sweck v. Zoning Board of Review,* 77 RI 8, 72 A2d 679 (1950); *O'Neill v. Philadelphia Zoning Board of Adjustment,* 384 Pa 379, 120 A2d 901, 904-5 (1956).

### The Charge of Discrimination Resulting in Denial of Equal Protection

Before closing the phase of the appeal relating to the presentation of evidence, we turn our attention to the challenge raising the question of discriminatory action on the part of the Milwaukie Council.

If discrimination is present then it is violation of that part of the Fourteenth Amendment reading, "No State shall make or enforce any law which shall  *  *  * deny to any person within its jurisdiction the equal protection of the laws." Although not expressed in precisely the same language, discrimination would be equally offensive to its near counterpart in the Oregon Constitution, Section 20 of Article I, reading: "No law shall be passed granting to any citizen or class of

citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." The tests are substantially the same. *State v. Savage,* 96 Or 53, 59, 184 P 567.

Success in behalf of the proposition depends entirely upon what appellant claims was evidence developed during the trial.

Appellant's charge here is predicated on the proposition that when there are two other churches in the area, a denial of appellant's application constitutes unlawful discrimination against it and there is, therefore, deprivation of the equal protection accorded by the Fourteenth Amendment of the Constitution of the United States and the Constitution of Oregon.

■ It is well settled that when there is an actual discrimination, it is a violation of the equal protection accorded by the Fourteenth Amendment. *Fowler v. Rhode Island,* 345 US 67, 97 L Ed 828, 73 S Ct 526 (1953); *Skinner v. Oklahoma,* 316 US 535, 86 L Ed 1655, 62 S Ct 1110 (1942). It must, however, be supported by evidence.

■ Here, the discrimination asserted rests entirely upon the assumption of the existence of a certain state of facts. In making the charge, the appellant is confronted with the presumption that in the administration of a statute or ordinance, it will be so administered by the body charged with its enforcement as to render its application valid. It will not be assumed that the Council will enforce the law in such a manner as to produce inequity or denial of due process or that the power conferred will be abused or improvidently exercised. 16 CJS 468, Constitutional Law § 100; *American Power Co. v. S. E. C.,* 329 US 90, 112, 91 LEd 103, 67 S Ct 133; *Yakus v. U. S.,* 321 US

414, 434, 88 LEd 834, 64 S Ct 660; and cases previously cited.

We observe that at the threshold of our consideration of the charge of discrimination, we are confronted with an anomalous situation produced by the appellant. We recall that during the course of the oral argument, counsel for appellant complained because the trial court denied it an opportunity to produce evidence of discrimination. Our examination of the record reveals no basis for such representation. To the contrary, appellant was given that opportunity but failed to embrace it. Notwithstanding the representation made orally, its brief on the subject rests upon the assumption that evidence of discrimination is before the court.

The statement made by appellant's counsel in this court may have been an inadvertence, due in part to the fact that he was not the trial counsel in the lower court. We would be inclined to ignore and excuse it were it not for certain misstatements of fact which appear in appellant's brief and to which we will presently make reference.

The only evidence which can be relied upon to demonstrate discriminatory action upon the part of the Council, if any, and the only record remotely referring to the presence of two other churches in the city of Milwaukie, or wherever they are located in that city, is entirely encompassed in the replies of appellant's two witnesses, Mr. Hughart and Mr. Klein. The former, when asked whether there were "other churches located in the vicinity of your property in Milwaukie," answered, "definitely," naming two as "very close" and "maybe others." The only question addressed to Mr. Klein on the subject was the one wherein he

was asked if "*since* this permit [appellant's] was denied" the Council had not granted permission "to other churches to construct buildings in the City of Milwaukie." He answered that he was not aware that the Council had or had not issued any permits to other churches since the denial of the Witnesses' application. Whereupon, counsel terminated his examination. He made no further attempt during the trial to introduce any records or other testimony bearing on the issuance of permits, if any, to "other churches" before or after the time of the denial of appellant's application, notwithstanding the door of opportunity had been opened by the court's ruling on the question asked of and answered by Mr. Klein. If the record in the lower court is as incomplete as appellant represented during the time of oral argument here, it was the result of a want of diligence on the part of trial counsel to have made it otherwise.

The record here tells us nothing more concerning the existence of the "two other churches" than is comprehended in the two short answers of the witnesses mentioned. We do not know that either of such churches are in the same zone where appellant's property is located or whether in an unzoned portion of the city, even though in the vicinity of appellant's lots, or "very close", as stated by the witness Hughart. We do not know when either of the other churches was built in Milwaukie, that is, before June 24, 1946 (the effective date of the zoning ordinance), or after that date. On the other hand, from a reading of the ordinance, we do know that if "other churches" were built before that date and in the same, but later-zoned area, then such churches are classified as "non-conforming" property, untouched by the operation of the ordinance (Ordinance No. 481, § 23). If, however, the other

churches were granted building permits after June 24, 1946, we know not when or where, nor whether the same conditions of traffic congestion and hazard which militated against the appellant were existent at the time of the construction of the "other churches" or to the same degree. The time of the building of the "other churches", their location, and when permits, if any, for their erection were issued, are matters of proof which should have been within easy reach of the appellant. We have not even been supplied with the boundaries of the various zones established by Ordinance No. 481.

But, notwithstanding the paucity and vague character of the testimony concerning "the other churches," and the record's silence concerning particulars which might, if relevant, be helpful in determining whether the appellant was the victim of discriminatory action, appellant's brief is replete with statements which, contrary to the record, assume a state of nonexistent facts. It is upon these erroneous representations of the evidence that the appellant predicates its entire argument as being a victim of discrimination.

The following are phrases exemplifying these palpably incorrect assertions: "It has been demonstrated from *the statement of the evidence* * * * that no other church has been required to show no traffic congestion or denied an application for a permit. This is discrimination * * *." Again, on the same page: "*It also has been shown* that there are churches in the very same neighborhood that have been permitted to operate without objection on account of traffic congestion." And at page 36 of appellant's brief, is this further statement: "*Permitting other churches* to be operated in the same neighborhood while denying plaintiff the right to build and use the build-

ing in question as a church constitutes discrimination
* * *." (Emphasis ours.)

Resting upon the foregoing false hypothesis, the appellant then makes the following extravagant statement: "The only objection that the defendants *have urged* or can urge is that the defendants do not like the religious practices of Jehovah's Witnesses and their attending the plaintiff's church * * *." (Emphasis ours.) We cannot pass such an unwarranted and unjust conclusion without comment. It is unfair to the Council. It is unfair to those representing the Council in this matter. Not only does the brief of respondents fail to disclose one iota of hostility toward appellants, but there is not one word in the record from whence an inference of such intolerance or prejudice on the part of the Council can be derived. We find nothing resulting from the action of the Council which would warrant us in concluding that discrimination was a resulting incident of the Council's denial.

If there was evidence of discrimination, we would give it careful consideration and likewise to the various authorities offered by the appellant in support. But finding no evidence of discriminatory action, we conclude that appellant's claim in this respect is wanting in merit.

■ At the trial the Witnesses had the burden of proof but not only failed utterly to prove discrimination but also failed to establish that the Council in its consideration of the application acted arbitrarily and capriciously as previously defined. There was no evidence to overcome the presumption of reasonableness and validity which the law accords to such administrative decisions in zone matters.

*Charge Relating to*
*Denial of Use of Property without Due Process*

Here again we have a charge of infringement upon the constitutional rights of appellant as protected by the Fourteenth Amendment, namely, the part declaring no state shall "deprive any person of life, liberty, or property, without due process of law."

This necessitates a consideration of when property, such as appellant's, is amenable to the sovereign's exercise of the police power.

No better statement of the reason for zoning regulations has been made than that by Mr. Justice Sutherland in *Euclid v. Ambler Co.*, 272 US 365, 386, 387, 47 S Ct 114, 71 L Ed 303, 54 ALR 1016 (1926), appropriately referred to in Synod of Ohio of the United Lutheran Church (39 NE2d, supra, 515) as "the cornerstone of the modern law of use zoning":

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, *and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities.* Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. *Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations,* which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the mean-

ing of constitutional guaranties never varies, *the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation.* In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall." (Emphasis ours.)

The relative newness of zoning ordinances and the necessity that "the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation" pointed out by Mr. Justice Sutherland in *Euclid, supra,* has been approved and followed by this court: *Shaffner v. City of Salem,* 201 Or 45, 51 268 P2d 599, and in *Page v. City of Portland,* 178 Or 632, 638, 165 P2d 280, where we said:

"Zoning, however, is not static. It changes with changed conditions and the complexities of a modern age. If the rule were otherwise, there could be no progress. A regulation concerning the use of property might be considered reasonable today whereas, under different conditions, would be deemed so arbitrary and unreasonable as to amount to confiscation."

■ The foregoing conclusions recognizing the impact of changing conditions upon the application of zoning ordinances and the need for flexibility require that we give close heed to the particular and controlling circumstance present in each earlier case cited and relied upon by the appellant. It does not follow that conditions which impelled and justified certain conclusions respecting the allowance of applications five,

ten, fifteen or more years ago, would result in the same holdings, if made today, concerning the same locations in the light of currently changed conditions. This is especially true in the earlier cases where and when traffic conditions, traffic congestion and its incident dangers and annoyances were dispatched as having no validity as a reason for denying applying churches the right to build in residential areas. Such are the impacts resulting from our rapidly changing economy, community concepts, increasing populations. All of these newer conditions are intensified, in large measure, by a drift of people from rural to urban communities, with the migrations of great numbers from one established geographical area to others far distant, leaving some towns and villages much smaller and enlarging the size of others, and leaving all with new governmental and social problems to meet, particularly in the area of transportation. Beginning with 1940, Oregon has in a lesser, yet very noticeable way, felt the effect of such residential changes by migrations, as well as by normal population growth. The federal census shows a population growth in the state of Oregon of approximately 40% from 1940 to 1950, whereas the increase in the city of Milwaukie for the same period was 180%[3]. This knowledge gives emphasis to the oft-repeated judicial observation, that every zoning case must be evaluated in terms of the particular circumstances then and there attendant.

■ The Milwaukie zoning ordinance is an exercise of the police power. *Page v. City of Portland* (178 Or, supra, at 637) ; *Holt v. City of Salem,* 192 Or 200, 207,

---

[3] Statistics from Federal Census Reports as recorded in Oregon Blue Book 1955, page 79:

|  | 1940 | 1950 |
|---|---|---|
| Oregon | 1,089,684 | 1,521,341 |
| Milwaukie | 1,871 | 5,253 |

234 P2d 564; and cases there cited, and in principle, is a valid exercise of that power. *Village of Euclid v. Ambler* (272 US 365, supra).

Obviously, it cannot be logically argued that a church building or its uses would adversely affect the health of the community. Nor can sound reasons for denying use permits to churches be predicated upon protection of public morals. We therefore limit our inquiry primarily to the effect of the legislation and Council's action upon what may be classified as the "general welfare" of the citizens involved, or, as sometimes stated, the "public welfare".

█ The term "public * * * convenience", as found in Section 3, supra, of the ordinance, is not used in a colloquial manner as being synonymous with "handy." The word "convenience" as there employed refers to what is fitting or suited to the public need. *West Hartford Methodist Church v. Zoning Board of Appeals*, 143 Conn 263, 268, 121 A2d 640 (1956).

The term "public welfare" baffles attempt to give it precise definition because of its constantly expanding concepts. "Sometimes it has been said to include public convenience, comfort, peace and order, prosperity, and similar concepts." Opinion of the Justices to the Senate, 333 Mass 773, 128 NE2d 557, 561 (1955). The breadth of its inclusive character has been recently attested in *Berman v. Parker*, 348 US 26, 75 S Ct 98, 99 L Ed 27 (1954), where, at p 33, Mr. Justice Douglas says:

"* * * The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc. v. Missouri*, 342 US 421, 424. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should

be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them  *   *   *."

■ So, too, it is not the function of this court to reappraise the minimum requirements for public welfare as declared by Section 3 of the ordinance before us. Notwithstanding that a zoning ordinance is truly an instrument designed in the public welfare, and thus superior to private property rights, it must also be reasonable, and not arbitrary in reach or administration, and must confer on the public a benefit commensurate with its burden on private property. *West Hartford Methodist Church v. Zoning Board* (143 Conn, supra, at p 268); *Berger v. City of Salem,* 131 Or 674, 679, 284 P 273; *Holt v. City of Salem* (192 Or, supra, at p 206).

■ As an exercise of the police power, the courts will review such zoning ordinances to determine whether they are a proper employment of that power, i.e., whether they are reasonable or arbitrary and have a substantial relation to the public health, comfort, morals or welfare. *Page v. City of Portland* (178 Or, supra, at p 637); *Holt v. City of Salem* (192 Or, supra, at p 206); 62 CJS, supra, 557, § 228 (1). The courts will not, however, interfere unless the action was clearly unreasonable and arbitrary and had no substantial relation to the legitimate objects sought to be gained, and will not review it if the question is fairly debatable. *Holt v. City of Salem,* supra, at p 207; *Shaffner v. City of Salem* (201 Or, supra, at p 51); *Page v. City of Portland,* supra, at p 640.

We must depend solely on the evidence adduced by the appellant at the trial. Such reasons, as the

testimony discloses, can be gleaned only from the testimony of Councilman Klein. From his statements we gather that among the persuasive factors dictating the Council's denial were traffic hazards, later referred to as traffic congestion, conditions of automobile noises, fumes and lights, particularly resulting from the parking and starting of cars at nighttime in the range of nearby residences. The witness Klein also stated that the Council took into consideration the effect on the values of the property in the immediate neighborhood, but we read this depreciation as an incident to increased traffic hazards and congestion and not because of the mere presence of a church in the zoned area.

Appellant's brief speaks of these reasons as if limited only to the factors of "congestion of traffic and annoyance of neighbors." We think that "annoyance of neighbors" comprehends the noises, fumes and lights referred to by Mr. Klein. We also believe that "traffic congestion" includes the "traffic hazards." We will therefore consider the reasons as delineated by appellant: "congestion of traffic and annoyance to neighbors," as the prime reason for denying the application.

Confining ourselves to the known reasons as expressed by Mr. Klein for the denial of the application, that is, traffic congestion hazard, and the discomforts arising from noise, fumes and lights, we find that each falls within the purview of the standards established by Section 3 of the ordinance, supra, and each one is a subject bearing a substantial relation to or reasonably necessary for the protection of the public health, safety, morals and general welfare to warrant regulation through the exercise of the police power. All have found judicial approval in "church" zoning cases

as conditions having a substantial relation to the public welfare.

## Traffic Congestion

"Among the many problems pressing for solution in the crowded metropolitan areas of America, traffic congestion still takes its rightful place near the top of the list." 2 Yokley, Zoning Law and Practice (2d ed), 77 § 208. Mr. Justice Emmert in his dissenting opinion in *Board of Zoning Appeals v. Decatur, Ind. Co. of Jehovah's Witnesses,* supra (117 NE2d 115), gives pungent expression to the same thought where he says:

"Our city streets are too often choked with automobiles and automobile traffic, which endanger the general public as well as the traveling public, because cities were planned for horse and buggy transportation. What might have been an unreasonable exercise of the police powers in the days of the Model T may be clearly valid now under the growing menace of the automobile, which in the Nation has been taking an annual toll of more than 30,000 killed and over a million injured." (at p. 122.)

In line with the foregoing observations of Yokley and Emmert, J., we take judicial notice of the extraordinary expansion in motor vehicle traffic in the State of Oregon and County of Clackamas, wherein Milwaukie is its second largest population center. From 1946 (the year of the adoption of Milwaukie Ordinance No. 481) to 1953 (the year appellant made its application to build), the registration of motor vehicles in Oregon increased 62.5%. During the same seven-year period the increase of those owned in Clackamas County was 51%.[4]

---

[4] The following information from Annual Reports of the Secretary of State for the years indicated:

*Motor Vehicle Registration*

|                     | 1946    | 1953    |
|---------------------|---------|---------|
| State of Oregon     | 470,214 | 762,606 |
| County of Clackamas | 25,390  | 38,358  |

    Certainly, these rapid increases in population previously referred to, and these substantial increases in motor registration, give emphasis to the danger of relying too heavily on the factual presentation of any earlier zoning case, be it from Oregon or other jurisdiction.

■ "Traffic congestion" is a phrase comprehending many facets. As used in a matter of this kind, it implies all of the nuisances, inconveniences and hazards to which the public generally, and those residing in the zone area, may be exposed. Off-street parking would, no doubt, in some places tend to minimize some of the disadvantages of such congestion, but it cannot be expected to avoid all of its resulting annoyances and potential dangers. The incidents of traffic congestion include, among other things, noise, fumes, the intrusion of automobile lights, the blocking of private driveways by parked cars, and delays in normal travel for those using the highways. But most important are the increased dangers to injury of persons and property. We do not mean to infer that the church-going public is less diligent than others in their respect for the traffic laws. However, even the worthy and cautious persons of that class and their children are too often the victims of the careless.

Such evidence as the appellant marshals to describe its own use of its projected church is in terms of its stated services and its instruction meetings on certain days of the week, at its appointed times on those days, with the probable number of automobiles to be used by its members at such times. But such a limited presentation of use does not tell the whole story, nor in itself impeach the Council's reasons for denying a building permit on the ground of traffic congestion.

The test of whether or not the building of a church in a given zone will produce traffic congestion or augment existing traffic conditions to a point of hazard can not be made solely in terms of what a given number of church members might produce with their probable use of a certain number of automobiles. If a church is, perchance, in an area where few people live or travel, then it might be relatively easy for a zoning board to determine, in the absence of other circumstances, that the building of a place of worship at such a given site, within the restricted zone, would not create traffic problems. If so, it would be unreasonable to deny such a religious organization an opportunity to erect its building at that point. On the other hand, if traffic congestion is already a real or threatening problem near the site where a congregation desires to build, and the church would bring to that community enough additional vehicles to definitely establish congestion at that point, then the Council would be reasonably warranted, if not duty-bound, to deny a permit for its erection. In the absence of appellant's evidence to the contrary, it must be presumed the Council gave consideration to and balanced all of those factors.

In *Cox v. New Hampshire,* 312 US 569, 85 LEd 1049, 61 S Ct 762 (1940), members of appellant's faith were arrested for a violation of a statute prohibiting parades in the city streets without first securing a special license therefor from the selectmen of the town or city in which the parade was to be held. In the parade, each of the members participating carried banners propagandizing their religious beliefs. The appellant Cox claimed an infringement of their constitutional liberties by reason of the licensing statute.

In disposing of the matter adversely to them, Mr. Chief Justice Hughes says at p 574:

"\* \* \* The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. *Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.*" (Emphasis ours.)

We can see no difference in principle between the control of traffic congestion by direct legislation to the subject, as in the Cox case, supra, and the supplementation of such control under the police power by a less direct method of avoidance, when necessary through the avenue of the zoning ordinance.

▓ The very theory of zoning is one of balancing public interests against private interests. In *Shaffner v. City of Salem* (201 Or at 52) we quoted with approval a statement from 8 McQuillin, Municipal Corporations (3d ed), 82 § 25.40, of which the following was a part:

"\* \* \* the detriment to public welfare that would result if zoning restrictions were removed must be weighed against benefit that would accrue to individual property owners \* \* \*."

▓ When we speak of traffic hazards and congestion on the streets of any city, we are talking about a condition of potential danger to life and property which in point of public welfare extends beyond the bound-

aries of any zoned area and the interests of those who reside within it. Such a hazard touches the lives of all citizens whose social or business interests may temporarily draw them to such a restricted zone. There are few dangers to public welfare that are so all-embracing as are the dangers and hazards to young and old springing from traffic on our highways. In denying appellant's application to build a church and predicating the denial in whole or in part upon probable traffic problems, the Council necessarily considered three, rather than the usual two, points of view, to wit: (1) effect on the appellant as a landowner; (2) effect, if any, on those owning property on residential streets in the residential zone; and (3) the effect on the general public of the community, no matter where they resided in Milwaukie. 8 McQuillin, Municipal Corporations, supra, 83 § 25.40.

█ We are of the opinion that objectives of the Milwaukie zoning ordinance bear a substantial relation to the public health, safety, and general welfare of the citizens of that city sufficient to warrant regulation by exercise of the police powers; that the council's action in denying appellant a permit to build a church in the residential zone at the particular place chosen because of ensuing traffic congestion with its incident hazards and annoyances was, under the circumstances present here, a reasonable application of the police power in behalf of the public safety and general welfare. It follows that there is no merit in appellant's claim that it has been deprived of the use of its property without due process of law.

### Charge of
### Denial of Religious Freedom

This claim of constitutional infringement rests upon the assertion that the denial of the permit upon "the

grounds of congestion of traffic and annoyance to neighbors in the area constitutes a denial of freedom of religion, freedom of worship and freedom of assembly contrary to the First and Fourteenth Amendments and the Constitution of the State of Oregon."

■ The fundamental concept of liberty embodied in the Fourteenth Amendment embraces the liberties guaranteed by the First Amendment. *Cantwell v. Connecticut,* 310 US 296, 303, 60 S Ct 900, 84 L Ed 1214, 128 ALR 1352 (1940).

One phase of the argument relating to invasion of religious liberties is premised upon the proposition that "it cannot be left to *the uncontrolled discretion* of any public official as to when, where and under what conditions a religious organization may build a church or maintain a place of assembly." (Emphasis ours.) As an abstract proposition, we find ourselves in accord. We also find that the Federal authorities cited by appellant give support to the proposition as above stated.

■ Although the Supreme Court has been strict in its prohibition of prior restraint, on the exercise of freedom of religion or speech, it has held that reasonable regulations of time and place for the exercise of such freedoms are valid. *Cantwell v. Connecticut,* 310 US 296, 306 (1940); *Cox v. New Hampshire,* 312 US 569, 574, 85 LEd 1049, 61 S Ct 762 (1940); *Prince v. Massachusetts,* 321 US 158, 88 LEd 645, 64 S Ct 438 (1943); *Kovacs v. Cooper,* 336 US 77, 93 LEd 513, 69 S Ct 448 (1948); *Kunz v. New York,* 340 US 290, 95 LEd 280, 71 S Ct 312 (1950).

We have recently expressed ourselves in the same tenor. See *Baer v. City of Bend,* 206 Or 221, 292 P2d

134 (1956), an opinion of Mr. Justice LUSK, where we said at p 229:

"It has never been held, said Mr. Justice BELT, speaking for this court in City of Portland v. Thornton, supra, 174 Or at p 513, that 'the practice of religion is beyond reasonable limitation.' As stated by the Supreme Court of Appeals of Virginia in Rice v. Commonwealth, 188 Va 224, 234, 49 SE2d 342, 3 ALR2d 1392, 'The individual cannot be permitted, on religious grounds, to be the judge of his duty to obey the regulatory laws enacted by the State in the interests of the public welfare. The mere fact that such a claim of immunity is asserted because of religious convictions is not sufficient to establish its constitutional validity.' "

In the Baer case, 206 Or at 234, we also held:

"Incorporation of the First Amendment into the Fourteenth has not rendered the states and their political subdivisions impotent to enact reasonable laws for the protection of the public health."

Although the law before the court in the Baer case was one related to public health, we think the phrase is equally applicable to measures and administrative decisions designed for the protection of public welfare. "It is to be borne in mind that 'Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practice.' *Reynolds v. United States,* supra, 98 US at p 166." (206 Or, supra, at p 234).

Here, however, there is no evidence the ruling of the Milwaukie Planning Commission or that of the Milwaukie Council was the product of "the uncontrolled discretion" or arbitrary action on the part of either administrative entity. To the contrary, hearings were had and presumptively, and in the absence of any testimony to the contrary, the trial court, as well as this court, is warranted in concluding that the judg-

ments of both bodies were formulated within the ambit of the standards established for their governance by Section 3, supra, of the ordinance. These apply alike to churches, schools, lodges, telephone and electric companies and all others who are entitled to apply for special use permits under Section 8, supra, of the ordinance.

There is a tendency upon the part of some authors, text writers, and a few courts, to cloak petitioning churches with a species of judicial favoritism under the zoning laws which seems to vest them with an immunity beyond the reach and touch of certain zoning provisions. The argument of appellants strongly suggests dependency upon such viewpoint, notwithstanding that it accepts the doctrine of the Porterville case, to which we will later give attention. Speaking generally to the subject, we find, for example, that some seize upon statements like the following of the Indiana Supreme Court, in the Decatur case, 117 NE2d, supra, at page 119: "The law is well settled that the building of a church may not be prohibited in a residential district", as a dogmatic and immutable injunction against the denial of any church's application to build in a zoned area. This, of course, is not true for reasons which will presently appear. It was not even so intended by the Indiana Court, which elsewhere in the same opinion correctly says: "building of churches is subject to such reasonable regulations as may be necessary to promote the public health, safety, or general welfare" (117 NE2d, supra, at p 118). And, of course, the determination of whether there is such a reasonable necessity for denying a permit to build must, as we have said, be governed by the facts and circumstances evidenced in each separate case wherein an application for a permit is made.

Even while invalidating a statute affecting freedom of religion, a unanimous court in *Cantwell v. Connecticut,* 310 US 296, at 303-04, 84 LEd 1214, 60 S Ct 900, speaking through Mr. Justice Roberts, said:

"The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. *Conduct remains subject to regulation for the protection of society.* The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order *and comfort of the community,* without unconstitutionally invading the liberties protected by the Fourteenth Amendment." (Emphasis ours.)

The only issue involved in the assignment relating to freedom of religion is whether zoning regulations, which appellant admits all other property owners would have to comply with, are a violation of freedom of religion when applied to plaintiff. Mr. Justice Reed gives clear answer to the question in *Jones v. City of Opelika,* 316 US 584, 593-594, 86 LEd 1691, 62 S Ct 1231. While that case was subsequently reversed, the force and truth of his thought remains unimpaired:

"We turn to the constitutional problem squarely presented by these ordinances. There are ethical principles of greater value to mankind than the guarantees of the Constitution, personal liberties which are beyond the power of government to impair. These principles and liberties belong to the mental and spiritual realm, where the judgments and decrees of mundane courts are ineffective to direct the course of man. The rights of which our Constitution speaks have a more earthy quality. They are not absolutes to be exercised independently of other cherished privileges, protected by the same organic instrument. Conflicts in the exercise of rights arise, and the conflicting forces seek adjustments in the courts, as do these parties, claiming on the one side the freedom of religion, speech and the press, guaranteed by the Fourteenth Amendment, and on the other the right to employ the sovereign power explicitly reserved to the State by the Tenth Amendment to ensure orderly living, without which constitutional guarantees of civil liberties would be a mockery. Courts, no more than Constitutions, can intrude into the consciences of men or compel them to believe contrary to their faith or think contrary to their convictions; but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech or of the press or the free exercise of religion, and to determine whether the claimed right is limited by other recognized powers, equally previous to mankind. So the mind and

spirit of man remain forever free, while his actions rest subject to necessary accommodation to the competing needs of his fellows.

"* * * One man, with views contrary to the rest of his compatriots, is entitled to the privilege of expressing his ideas by speech or broadside to anyone willing to listen or read. Too many settled beliefs have in time been rejected to justify this generation in refusing a hearing to its own dissentients. *But that hearing may be limited by action of the proper legislative body to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order.*" (Emphasis ours.)

Examples of such permissible limitations on the exercise of the freedom of religion will be found in *Reynolds v. U. S.,* 98 US 145, 25 L Ed 244, upholding prohibition of the practice of polygamy; *Hamilton v. Regents of the University of California,* 293 US 245, 79 L Ed 343, 55 S Ct 197, approving the exclusion of students who for religious reasons refuse to take prescribed Reserve Officers' training; *Prince v. Massachusetts,* supra (321 US 158), holding as valid a statute denying children the right to sell religious periodicals on the streets. Also see *City of Portland v. Thornton,* supra (174 Or 508), wherein this court, following the Prince case, upheld an ordinance of similar purport.

Obviously, while freedom of religion cannot be suppressed, its exercise is subject to restraint by reasonable regulations. Mr. Justice Frankfurter expressed these views in *Carpenters Union v. Ritter's Cafe,* 315 US 722, 86 L Ed 1143, 62 S Ct 807, at page 726:

"* * * Whenever state action is challenged as a denial of 'liberty', the question always is whether the state has violated 'the essential attributes of that liberty'. Mr. Chief Justice Hughes

in *Near v. Minnesota,* 283 US 697, 708. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people  *  *  *. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise'. *Ibid,* at 707. 'The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.' *Hudson Water Co. v. McCarter,* 209 US 349, 355.''

We now turn our attention to what is said by other courts where the matter of traffic congestion has been given as a reason for denying the erection of a church in a zone restricted to single family dwelling units.

The infrequency of the attempts of zoning authorities to prevent the erection of churches in residential districts is attested by the paucity of reported cases dealing with the precise questions projected by this appeal. This overall situation in turn results in few "church" cases which treat with the reasons upon which the Milwaukie Council predicated its refusal of appellant's application.

There are quite a few cases relating to the building of parochial schools, orphanages, old people's homes and like institutions, but we confine our attention as far as possible to those treating with the application of building permits for churches alone.

The following are recently adjudicated zoning cases wherein a religious organization was denied the right to build a church in a residential zone because it

would contribute to traffic congestion in the location selected. Thus, they recognize that such reason had a substantial relation to public safety and general welfare, and hence did not constitute a deprivation of property without due process of law nor a limitation on the constitutional religious freedoms: *West Hartford Methodist Church v. Zoning Board*, 143 Conn 263, 121 A2d 640 (1956); *Miami Beach United Lutheran Church v. City of Miami Beach*, 82 S2d 880 (1955); *Galfas* (acting in behalf of Jehovah's Witnesses) *v. Ailor*, 81 GaApp 13, 57 SE2d 834 (1950).

In the West Hartford Methodist Church case, supra, the zoning board, under the permissive type of ordinance, refused a permit for these reasons among others, "undue concentration of traffic" and "substantial depreciation in value of surrounding property". The Supreme Court of Connecticut in sustaining the action of the board said, 121 A2d at page 643:

"We need not repeat the facts which demonstrated to the board that the use of surrounding homes will suffer substantial injury if 240 South Main Street is utilized as planned. Suffice it to say that these homes will lose much of the peace and quiet now enjoyed by their owners. Values will fall; traffic, with its attendant danger and noise, will increase greatly on Crestwood Road and other side streets; and the privacy of some homes will disappear with the advent of a large parking lot at their very boundary."

In Miami Beach United Lutheran Church, supra, the church sought to build in a single family dwelling zone. In affirming the denial of plaintiff's application, the following statement is made:

"Evidently the property is located on a state highway, often heavily travelled. From testimony the chancellor was privileged to believe, the value

of the surrounding property would 'definitely depreciate' * * *." (82 So2d at p 882).

The Galfas case, supra, has a particular interest in that the organization seeking the right to build under a permissive type of ordinance like the instant one was a segment of the same religious group as appellant. There the testimony was substantially the same as here concerning the size of the congregation, the frequency of its meetings and probable automobile use of its members. In approving the action of the zoning board in refusing the permit, the court says:

"* * * Under the record before this court in the present cases it does not appear that there was an abuse of the discretion and judgment vested in the Board of Zoning Appeals in determining that it was undesirable to permit the location of a church at the proposed site in that it would likely create a serious traffic problem, considering the number of vehicles that would be brought into the area and the number of those which could be parked off the street and around the proposed building. * * *" (57 SE2d at 836)

We now examine cases relied upon by appellant wherein the application of churches to build in single residential zones were initially denied by zoning authorities for reasons of traffic congestion, but later reversed by the appellate courts. They are: *State ex rel. Synod of Ohio United Lutheran Church v. Joseph,* supra (39 NE2d 515); *Board of Zoning Appeals v. Decatur, Ind. Co. of Jehovah's Witnesses,* supra (117 NE2d 115); *Mooney v. Village of Orchard Lake,* 333 Mich 389, 53 NW2d 308 (1952); and *State ex rel. Howell v. Meador,* 109 W Va 368, 154 SE 876 (1930).

A unique situation is presented in the Synod case, which in our opinion is alone sufficient to invalidate it as an authority in the instant matter. The zoning

ordinance of Upper Arlington, a suburb of Columbus, Ohio, had a permissive provision comparable to Section 16 (8) of the Milwaukie ordinance. There the zoning commission was directed to hold hearings on applications for permits to erect buildings in the single family dwelling zone (Class I). The proviso listing potential permittees included among other institutions "churches".

But notwithstanding, the Zoning Commission arbitrarily rendered this provision nugatory and inoperative as to churches, by formally adopting a resolution declaring that all applications to erect churches in Class I district would be denied as long as land was available in Class III district. Relying solely on the force of this resolution, the Zoning Commission without a hearing and without giving any reasons therefor, denied plaintiff-church's application to build in Class I district. The court, 39 NE2d at p 520, stated the issue in these words: "*Specifically the crucial question* is whether the local zoning authorities can * * * refuse a special permit for the erection of a church in a class I district, in pursuance of a general policy adopted formally by resolution 'that all applications for permits to erect churches in class I, or single family house districts, as long as class III, or business property is available, be refused'." (Emphasis ours.) In answer to the question, the court reached its decision by holding the zoning commission was not authorized by the ordinance from whence it derived its powers to reject the application for the reasons embodied in the resolution. But at great length indicated obiter the court's belief that any fiat exclusion of churches from residential districts would be unconstitutional. It is from the realm of this dictum that appellant draws in support of its contentions. It is in this area that will be found what

is said about traffic congestion and where it will be discovered that, even there, the views expressed are controlled and limited to the particular facts and circumstances presented by the record in that matter.

In the Decatur case, the permit was denied "because of noncompliance with the building set-back line and the failure to provide off-street parking space as required by the ordinance" (117 NE 2d, supra, at 116). The sole question presented by the appeal, as stated by the court, was: "Are the restrictions imposed [by the ordinance] reasonable regulations on the building of a church *at the location and under the facts and circumstances as shown by the record before us*?" (117 NE2d, supra, at page 118). (Emphasis ours.) Although the ruling was for the church under the evidence, the court expressly recognized that churches are amenable to zoning regulation. At p 118 the court observes: " * * * the building of churches is subject to such reasonable regulations as may be necessary to promote the public health, safety, or general welfare", citing *Cantwell v. Connecticut,* supra, *Commonwealth of Mass. v. Prince,* supra, and *West Virginia State Board of Education v. Barnette,* 319 US 624, 63 S Ct 1178, 87 LEd 1628, 147 ALR 674.

In the Mooney case, the plaintiff (as Archbishop of the Catholic Archdiocese of Detroit) sought a permit to build a church and school under an ordinance which "served, as a practical matter, to exclude churches and schools from the village" of Orchard Lake (53 NW2d, supra, at p 309). The court stated the matter to be adjudicated as follows: *"On the basis of the record at bar* the question to be determined is whether churches and schools may, in effect, be excluded by ordinance from the entire village." (53 NW2d supra, at p 309.) The court, relying on a provision of the

constitution peculiar to the State of Michigan and having its genesis in the Ordinance of 1787, governing the Northwest Territory, resolved the question in favor of the applicant church. We think it appropriate to observe here, that the instant case presents no comparable question. Churches are not excluded under the Milwaukie ordinance, they can build without permit in any of the other three zoned areas, and in the single family dwelling zone with permit. The court in the Mooney case, as in the Synod and Decatur cases, supra, notes that the right to full and free use and enjoyment of one's property "is, however, subject to reasonable regulation, restriction and control by the state in the legitimate exercise of its police powers. The test of legitimacy is the existence of a real and substantial relationship between the exercise of those powers in a particular manner in a given case  *  *  *." (at p 309)

In the West Virginia case of *State ex rel Howell v. Meador,* supra, wherein the plaintiff, Howell, acted as a Trustee of the Church of God of Beckley, W. Va., the prime question called for a construction of the ordinance wherein the court correctly held that a church by the very terms of that ordinance (and unlike that of Milwaukie) was not excluded from the residential areas. The court also gave attention to the question of traffic at the place designated by the church for building and concluded from *the facts* as enumerated that it would create no traffic problem.

"Much of the difficulty in cases invalidating the exclusion of churches," says 70 Harvard Law Review, "Churches and Zoning," 1431 (1957), "results from the courts' giving too narrow a construction to 'general welfare' and consequently taking too restrictive a view of the permissible scope of zoning. Under the view

adopted by the Court in the *Berman* case the factors that make churches undesirable neighbors should be considered sufficient to give a municipality power to exclude them from residential neighborhoods, even though it may appear to courts and to zoning authorities that there is social value in locating churches in residential areas."

## *The Archbishop of Oregon v. Baker Case*

Appellant makes frequent use of the case *Archbishop of Oregon v. Baker,* 140 Or 600, 15 P2d 391 (1932), as supporting authority for miscellaneous propositions of law advanced throughout its brief.

We do not find that it can be thus appropriately employed, and is readily distinguishable from the case at bar both in terms of the law it stands for and the facts relied upon to support its cardinal legal holding. In the first place, it did not involve the building of a church, but a parochial school adjacent to a church already built. No issue of denial of freedom of religious rights was advanced nor referred to in the opinion.

In Baker the court invalidates the so-called permissive section of Portland's then zoning law, as one conferring arbitrary powers upon the city council with respect to the granting of permits to erect, not a church, but a parochial school upon contiguous property. After outlining the powers given to the council, the Court says: "Therefore, under this ordinance, if the Council and the Planning Commission refuse to initiate proceedings for a change, which either may or may not undertake, with or without any reason or excuse whatever, then the plaintiff, or the party desiring the change, is left to the caprice of the will of 50 per cent of the owners of property within the district described

by the ordinance." (140 Or, supra, at p 609.) The court then reviews *Yick Wo v. Hopkins*, 118 US 356, 6 S Ct 1064, 30 L Ed 220, and on the authority of that case strikes down the ordinance as to the manner of obtaining a special use permit in a residential area, saying: "The fact that defendants are given arbitrary power in any case is sufficient to condemn the ordinance in this respect." (at p 610.)

The provisions of the Milwaukie ordinance are in no sense comparable to the Portland ordinance as it was in 1930. Section 16 (8) provides for special use permits to churches, etc. Section 3 establishes the standards whereby to determine the propriety of such use. Section 10 provides for an appeal to the City Council from any interested citizen or administrative officer and insures a hearing after such notice with opportunity to permit "additional evidence" as may be deemed relevant to the issues involved. In no sense was appellant here dependent upon the whim of the planning commission or City Council "to initiate proceedings for a change" or upon the "caprice of will" of any number of property owners as in the Baker case, supra.

The court in Baker, after its holding above, turns to consider the contentions of the Council in opposition to the application. These were: adjacent property values would be lessened; the dangers accruing primarily to the school children in crossing the streets; the noises of the children and possible trespass on other property. These were disposed of by the court in terms of facts prevailing at that time (1930). (See *Scott Co. v. Roman Catholic Archbishop*, 83 Or 97, 163 P 88, where the rights to use the same property for church and school purposes was a subject of judicial determination in 1917.)

## The Porterville Case

Notwithstanding several cases cited by appellant suggest that a complete, absolute exclusion of churches from zoned residential areas might be held as unconstitutional, the appellant does not argue such a proposition here, and for the reason that the Milwaukie ordinance is not an ordinance of exclusion. Such a complete exclusion was, however, provided by the zoning ordinance of the City of Porterville, California, and given judicial approval in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. City of Porterville,* supra (203 P2d 823), dismissed for lack of Federal question, 338 US 805, 94 L Ed 487, 70 S Ct 78, rehearing denied, 338 US 939, 94 L Ed 579, 70 S Ct 342. Also see Chief Justice Vinson's later approving reference to the Porterville case in *American Communications Ass'n v. Douds,* 339 US 382, 397, 70 S Ct 674, 94 L Ed 925 (1950):

"* * * When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the Nation is an absurdity. We recently dismissed for want of substantiality an appeal in which a church group contended that its First Amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas." (Citing Porterville case, supra)

In Porterville, as here, it was contended the challenged ordinance operated as a restriction of right to religious worship and was beyond the reach of the police powers.

Notwithstanding that the Porterville case treats with an ordinance which excludes churches from single

family dwelling zones and with no provision for applications for permission for special use as found in the Milwaukie ordinance, and notwithstanding that appellant, referring to the Porterville case, concedes "that where the legislature has excluded all but private residences and no churches have been permitted in the area, then such a law may be said to be constitutional, depending on the circumstances of the particular case as to whether the zone includes most of the city," it still has a most important interest and significant application here. By giving judicial approval to the absolute exclusion of churches from zones reserved for single family dwellings, it is authority for the proposition that such a restriction can be a reasonable application of the police power, and, as was later demonstrated by *American Communications Ass'n v. Douds, supra,* (339 US at p 397), the Porterville exclusion is not an infringement upon the liberties guaranteed by the First Amendment.

Reason dictates that if the Porterville ordinance is not a denial of due process or equal protection of the law or the freedom of religion by reason of a complete exclusion of churches from an area zoned for single family residences, it therefore cannot be a denial of due process or equal protection of the law or an infringement on the religious liberties, to deny a permit to build a church within such area when it is apparent that it will create or intensify a condition of traffic congestion.

The Porterville case, at p 825, cites with approval the following statement from *Miller v. Board of Public Works,* 195 Cal 470, 492, 234 P 381, 38 ALR 1479:

"There are some decisions which do not uphold the validity of a zoning ordinance establishing strictly residential districts. We are of the opinion,

however, that the better reasoned cases are in favor of the validity of comprehensive zoning which establish strictly private home districts, and that the most which can be said of the cases to the contrary is that they merely show that this is a question upon which reasonable minds may differ."

We are in accord with this view.

We are also in agreement with the following observation from the Porterville case, supra:

"A single family residence may be much more desirable when not in an apartment house neighborhood or adjacent to a public building such as a church. The municipal legislative body may require that church buildings be erected to conform to health and safety regulations as provided in its building code and we see no reason to hold that churches may be erected in a single family residential area when a duplex, triplex, or other multiple dwelling can lawfully be excluded therefrom. The provision in the ordinance for a single famly residential area affords an opportunity and inducement for the acquisition and occupation of private homes where the owners thereof may live in comparative peace, comfort and quiet. Such a zoning regulation bears a substantial relation to the public health, safety, morals and general welfare because it tends to promote and perpetuate the American home and protect its civic and social values.

"We find no merit in plaintiff's contention that the application of the ordinance to the plaintiff results in an unwarranted restriction of religious worship." (203 P2d at p 825.)

■ The denial of a building permit to appellant did not prohibit any one of its members from religious worship. Moreover, there is nothing in the record before us to indicate that alternative opportunities to locate do not exist. We do know that a church

building could be erected without permit in one of the other zone areas; indeed, it is possible a permit might be issued on proper application as to another site in the same residential zone where traffic congestion would be less likely, or in an unzoned area of Milwaukie, if such exists.

We are not persuaded by appellant's argument that the denial of its application to erect a church in the zone reserved for single dwelling residences works a trespass upon its religious liberties as protected by the Federal or Oregon Constitutions.

The appellant having failed to sustain the heavy burdens cast upon it as a petitioner for mandamus, the judgment of the circuit court is affirmed.